IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANDRE CRAVER,

        Plaintiff,               No. 2: 11-cv-1344 MCE KJN P

    vs.

J. HASTY, et al.,                   <u>ORDER AND</u>

        Defendants.       <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that defendants Rayner and Hastey used excessive force in violation of the Eighth Amendment when they sprayed O.C. spray into his cell during a cell search.

        Pending before the court is defendants' summary judgment motion.  Defendants argue that they are entitled to qualified immunity.  After carefully reviewing the record, the undersigned recommends that defendants' motion be denied.

        Also pending is plaintiff's motion for sanctions.  For the following reasons, this motion is denied.

////

II.  Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[1]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

////

---

[1]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

1    Consequently, if the moving party meets its initial responsibility, the burden then

2    shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

3    See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

4    to establish the existence of such a factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material in support of its contention that such a

7    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13   1436 (9th Cir. 1987).

14       In the endeavor to establish the existence of a factual dispute, the opposing party

15   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

18   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19   genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

20   committee's note on 1963 amendments).

21       In resolving a summary judgment motion, the court examines the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

26   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4   show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

5   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

7   III.  Undisputed Facts

8           At all relevant times, defendants Hastey and Rayner worked at High Desert State

9   Prison ("HDSP").  At all relevant times, plaintiff was housed at HDSP.  At all relevant times,

10  inmate Dicey was plaintiff's cellmate.  On February 2, 2011, defendants were assisting in mass

11  cell searches in plaintiff's building.  Defendants approached the cell shared by plaintiff and Dicey

12  to conduct a cell search.

13          Defendants announced to plaintiff and Dicey that they were there to conduct a cell

14  search.  Neither defendant entered the cell.  Plaintiff cooperated with defendants during their

15  attempt to initiate the cell search.  Both defendants sprayed some amount of O.C. spray into the

16  cell.

17  IV.  Disputed Facts

18          The parties dispute the circumstances that led to the use of the O.C. spray

19  following the arrival of the defendants' at plaintiff's cell.  The parties also dispute the nature and

20  extent of plaintiff's injuries.

21                  *Defendants' Version of Events*

22          According to defendants, when defendant Hastey arrived at plaintiff's cell, he

23  instructed both plaintiff and Dicey to stop what they were doing and come to the cell door.  (Dkt.

24  47-2 at 5.)  Dicey disobeyed the order and began to rummage through items on the shelf inside

25  the cell.  (Id.)  Defendant Hastey again ordered Dicey to stop what he was doing and to show his

26  hands.  (Id.)  Dicey did not comply and instead replied, "fuck you."  (Id.)  Dicey continued to

1   conceal his hands on the shelf, and then grabbed an unknown object in his right hand.  (Id.)

2   Dicey closed his hand then walked toward the sink/toilet area.  (Id.)  Defendant Hastey was

3   concerned that Dicey was trying to destroy contraband.  (Id.)

4          Defendant Rayner ordered defendant Dicey to comply with defendant Hastey's

5   orders.  (Id.)  Instead, Dicey put his hands under towels under the sink, which still concealed his

6   hands.  (Id.)  Both defendants ordered Dicey to show his hands, with negative results.  (Id.)

7          Defendant Rayner then ordered Dicey to show his hands or else O.C. spray would

8   be used on him.  (Id.)  Dicey ignored defendant Rayner's warning.  (Id.)  Dicey kept his left hand

9   under the towels and then placed his right hand into the toilet directly under the sink.  (Id.)

10         It appeared to defendants that Dicey was attempting to destroy contraband.  (Id.)

11   Defendant Hastey again yelled for Dicey to get down and to show his hands, but Dicey ignored

12   his orders and continued to conceal his hands.  (Id.)  Defendant Rayner then sprayed O.C. spray

13   at Dicey in his upper chest area.  (Id. at 6.)  Over-spray from the spray struck defendant Hastey in

14   the face, mouth and nose, but did not immediately affect him  (Id.)  Defendant Hastey again

15   ordered Dicey to comply, but he refused.  (Id.)

16         Defendant Hastey then sprayed Dicey in the face with O.C. spray.  (Id.)  While

17   spraying Dicey, defendant Hastey continued to order him to get down, which he refused.  (Id.)

18   At this point, defendant Hastey lost his vision from exposure to O.C. spray and relinquished his

19   position in front of the cell to Sergeant Williams, who was standing next to him.  (Id.)  Defendant

20   Hastey then went to the restroom where he rinsed his face with cool water.  (Id.)

21         After defendant Hastey sprayed Dicey in the face with O.C. spray, Dicey

22   eventually complied with the order to get down.  (Id. at 16.)  Officer Jackson then placed both

23   plaintiff and Dicey in handcuffs and escorted them to the Facility D Program Office to be

24   medically evaluated.  (Id. at 17.)[2]

25

26        [2] Neither defendant addresses how plaintiff ended up getting sprayed with the O.C. spray.

1    Nurse Pearsal examined plaintiff approximately five minutes after the incident.

2    (Id. at 19.)  By the time she examined plaintiff, he had already self decontaminated from

3    exposure to O.C. spray by splashing himself with cool water.  (Id.)  Plaintiff was not in distress

4    and there was no indication that he required further medical attention.  (Id.)  Nurse Pearsal

5    conducted an unclothed exam of plaintiff and saw only signs of pepper spray exposure.  (Id. at

6    20.)

7                    *Plaintiff's Version of Events*

8            Plaintiff's version of events is contained in his verified complaint, verified

9    opposition and the verified declaration of inmate Dicey attached to plaintiff's complaint as

10   exhibit E.

11           According to plaintiff, when defendants came to his cell door, they yelled out, "t-

12   shirts, shower shoes and boxers!"  (Dkt. No. 1 at 5.)  The water and electricity to the cell were

13   turned off.  (Id.)

14           After hearing defendants' order, plaintiff approached the food portal.  (Id.)  Dicey

15   had his toothbrush and tooth paste in his hands.  (Id.)  Dicey then walked to the back of the cell

16   and put the toothbrush and tooth paste on a shelf.  (Id.)  Defendant Rayner yelled at Dicey to get

17   away from the shelf.  (Id.)  Dicey told defendant Rayner that he was putting away his toothbrush

18   and toothbrush and tooth paste.  (Id.)  Rayner then yelled at Dicey, "Let me see your fucking

19   hands!"  (Dkt. No. 51 at 3.)  Dicey yelled back, "Fuck you."  (Id.)  Defendant Dicey and Rayner

20   then began yelling, "fuck you" at each other.  (Id.)  Defendant Rayner stated that he was going to

21   tear up the cell and destroy the personal property.  (Id.)

22           Dicey then said, "I gotta piss."  (Id. at 4.)  Defendant Hastey told Dicey to go

23   ahead and piss.  (Id. at 4 and 24.)  Dicey then walked to the toilet.  (Dkt. No. 51 at 3.)  Defendant

24   Rayner became more angry because he was going to have to search a cell with urine in the toilet.

25   (Id.)  Defendant Rayner told Dicey, "piss on yourself, mother fucker.  Come cuff up."  (Dkt. No.

26   1 at 24.)  Defendant Rayner and Dicey continued swearing at each other.  (Dkt. No. 51 at 3.)

1    Defendant Hastey then ordered plaintiff to cuff up.  (Id.)  Plaintiff moved to the

2  food slot tray area.  (Id.)  Defendant Rayner and Dicey were still swearing at each other.  (Id.)

3  Dicey then pulled out his penis, showed it to defendant Rayner, and began urinating.  (Id.)

4  Rayner then said, "oh, you're going to disrespect me like that mother fucker."  (Id.)  Defendant

5  Rayner pushed defendant Hastey out of the way and began spraying O.C. spray into the cell.  (Id.)

6  Plaintiff felt the O.C. spray in his face.  (Id.)  Plaintiff moved to the back of the cell, choking and

7  coughing.  (Id.)  Dicey was on the cell floor.  (Id. at 5.)  Rayner sprayed the O.C. spray until his

8  canister was empty.  (Id. at 5 and 24.)  Defendant Hastey then stepped up to the food portal and

9  began spraying O.C. spray into the cell.  (Id. at 5.)  Defendant Hastey sprayed Dicey, then yelled

10  at plaintiff, "let me see your hands or I'll spray you again."  (Id.)  Hastey sprayed the O.C. spray

11  again, hitting plaintiff.  (Id.)

12    After defendants had depleted their O.C. spray cans, plaintiff and Dicey crawled

13  on their bellies to the food portal to cuff up.  (Id. at 5 and 25.)  Plaintiff was taken to the program

14  office where he was stripped naked and placed in a holding cage.  (Id. at 5-6.)  Plaintiff vomited,

15  coughed, shook, and his eyes, skin and face burned.  (Id. at 6.)

16    Licensed Vocational Nurse ("LVN") Reynolds came to plaintiff's holding cage.

17  (Id.)  Plaintiff told Reynolds that his eyes were burning but she walked off.  (Id.)  Four hours

18  later, plaintiff and Dicey were returned to their cell.  (Id.)  Plaintiff was still naked.  (Id.)  At 6:30

19  p.m., plaintiff was allowed to take a shower.  (Id.)

20  V.  Legal Standards for Qualified Immunity and Excessive Force

21    *Qualified Immunity*

22    Qualified immunity shields government officials from civil damages unless their

23  conduct violates "clearly established statutory or constitutional rights of which a reasonable

24  person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified

25  immunity balances two important interests – the need to hold public officials accountable when

26  they exercise power irresponsibly and the need to shield officials from harassment, distraction,

1   and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231

2   (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law,"

3   Malley v. Briggs, 475 U.S. 335, 341 (1986).

4           In resolving the claim of qualified immunity, the court must determine whether,

5   taken in the light most favorable to plaintiff, defendants' conduct violated a constitutional right,

6   and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121

7   (2001); Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009). Courts have discretion to address

8   the two-step inquiry in the order deemed most suitable under the circumstances. Pearson, 555

9   U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that

10  order, and the second step is reached only if the court first finds a constitutional violation);

11  Mueller v. Auker, 576 F.3d at 993–94.

12          A right is clearly established if "it would be clear to a reasonable [official] that his

13  conduct was unlawful in the situation he confronted ... or whether the state of the law [at the time

14  of the violation] gave fair warning to the official[ ] that [his] conduct was [unlawful]." Clement

15  v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (internal quotation marks and citations omitted).

16  This does not require that the same factual situation must have been decided, but that existing

17  precedent would establish the statutory or constitutional question beyond debate. Id.; Nelson v.

18  City of Davis, 685 F.3d 867, 884 (9th Cir. 2012).

19          *Excessive Force Standard*

20          The treatment a prisoner receives in prison is subject to scrutiny under the Eighth

21  Amendment. Helling v. McKinney, 509 U.S. 25, 31 (1993). A prison official violates the Eighth

22  Amendment when two requirements are met: (1) the deprivation alleged must be, objectively,

23  sufficiently serious; and (2) the prison official possesses a sufficiently culpable state of mind.

24  Farmer v. Brennan, 511 U.S. 824, 834 (1994). The state of mind required for an excessive force

25  claim is that the prison official applied force "maliciously and sadistically" so as to cause harm.

26  Hudson v. McMillian, 503 U.S. 1, 6–7 (1992); accord Whitley v. Albers, 475 U.S. 312, 320–21

1  (1986).

2      Five factors set forth in <u>Hudson</u> are considered in determining how the above

3  question should be answered; namely, "(1) the extent of injury suffered by an inmate; (2) the

4  need for application of force; (3) the relationship between that need and the amount of force

5  used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to

6  temper the severity of a forceful response." <u>Martinez v. Stanford</u>, 323 F.3d 1178, 1184 (9th Cir.

7  2003).

8      In <u>Hudson v. McMillian</u>, the Supreme Court rejected the notion that "significant

9  injury" is a threshold requirement for stating an excessive force claim.  The "core judicial

10 inquiry," was not whether a certain quantum of injury was sustained, but rather "whether force

11 was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically

12 to cause harm." <u>Hudson</u>, 503 U.S. at 7; <u>see</u> <u>also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 319–21

13 (1986).  "When prison officials maliciously and sadistically use force to cause harm," the

14 Supreme Court recognized, "contemporary standards of decency always are violated ... whether

15 or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical

16 punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of

17 injury." <u>Hudson</u>, 503 U.S. at 9; see also id. at 13–14 (Blackmun, J., concurring in judgment)

18 ("The Court today appropriately puts to rest a seriously misguided view that pain inflicted by an

19 excessive use of force is actionable under the Eighth Amendment only when coupled with

20 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks").

21 VI.  <u>Analysis</u>

22      A.  <u>Did Defendants' Conduct Violate Plaintiff's Constitutional Rights?</u>

23      Taken in the light most favorable to plaintiff, the undersigned first considers

24 whether defendants' conduct violated plaintiff's Eighth Amendment rights.  The first prong of

25 the qualified immunity analysis "mirrors the substantive summary judgment decision on the

26 merits." <u>See</u> <u>Sorrels v. McKee</u>, 290 F.3d 965, 969 (9th Cir. 2002).

1    The undersigned first observes that while defendants may not have intended to

2 harm plaintiff when they sprayed the O.C. spray, that fact does not give rise to a constitutional

3 violation. "[T]he Eighth Amendment does not require a further showing that the intent to punish

4 needs to be directed at a specific individual." Robins v. Meecham, 60 F.3d 1436, 1440 (9th Cir.

5 1995). The inquiry is not whether the use of O.C. spray was excessive as to plaintiff, but rather

6 whether the use of O.C. spray was excessive at all. "Excessive force directed at one prisoner can

7 also establish a cause of action for harm that befalls other prisoners." Clement v. Gomez, 298

8 F.3d 898, 905 n.3 (9th Cir. 2002) (citing Robins v. Meecham, 60 F.3d 1436, 1441–42 (9th Cir.

9 1995). The converse, then, must also be true: if force directed at one prisoner was not

10 "excessive," then harm befalling a nearby prisoner could not establish a cause of action as to him.

11 See Thomas v. Mendez, 2009 WL 89116, at *5 (C.D.Cal. Jan.13, 2009) ("plaintiff does not

12 contend that the force used by the officers was excessive as to [his cellmate]; he only contends

13 that it was excessive as to him. Under Robins, this is not enough to state an Eighth Amendment

14 excessive force claim").

15    The undersigned now considers the five Hudson factors set forth above.

16    *Nature and Extent of Plaintiff's Injuries*

17    While the parties dispute the nature and extent of plaintiff's injuries, taking the

18 facts in the light most favorable to plaintiff, his injuries were moderate. Plaintiff alleges that he

19 vomited and suffered burns to his skin and eyes. Plaintiff also claims that he was not allowed to

20 wash the O.C. spray from his skin until several hours after the incident.

21    *Need for Application of Force*

22    Under plaintiff's version of events, Dicey repeatedly refused to cooperate with

23 defendants' orders. Under these circumstances, a small use of force may have been justified by

24 defendant Rayner. However, according to plaintiff, defendant Hastey sprayed O.C. spray into the

25 cell when Dicey was on the ground and no longer resisting, having been sprayed by defendant

26 Rayner. Under these circumstances, the undersigned cannot find that any use of force was

1   justified at the time defendant Hastey allegedly used the O.C. spray.

2   *Relationship Between Need for Force and Amount Used*

3   While defendants have not clearly addressed the amount of O.C. spray used,

4   plaintiff (and Dicey in his declaration) claims that both defendants emptied their O.C. spray

5   canisters.[3]  In Clement v. Gomez, 298 F.3d 898, 901-02, 906 (9th Cir 2002), the Ninth Circuit

6   found no constitutional violation when officers applied two bursts of pepper spray into a cell,

7   each lasting five seconds, when one prisoner had another prisoner in a headlock, was punching

8   him in the face and slamming his head against the wall, and threatening to kill him.  In Furnace

9   v. Sullivan, 705 F.3d 1021, 1028 (9th Cir. 2013), quoting Spain v. Procunier, 600 F.2d 189, 195

10  (9th Cir. 1979), the Ninth Circuit noted that it had previously held that "'use of [tear gas] in small

11  amounts may be a necessary prison technique if a prisoner refuses after adequate warning to

12  move from a cell or upon other provocation presenting a reasonable possibility that slight force

13  will be required.'"

14  Taking the facts in the light most favorable to plaintiff, the alleged discharge of

15  both defendants' entire O.C. canisters was excessive.  Dicey's conduct did not warrant use of an

16  entire cannister of O.C. spray by defendant Rayner.  When defendant Hastey allegedly discharged

17  his entire can of O.C. spray, Dicey was on the ground and posed no threat.

18  *Threat Reasonably Perceived*

19  Taking the facts in the light most favorable to plaintiff, based on Dicey's

20

21  ───────────────

22  [3]  In Furnace v. Sullivan, 705 F.3d 1021 (9th Cir. 2013), the plaintiff alleged that
    defendants discharged their canisters of pepper spray until they were empty.  705 F.3d at 1026.
    The district court granted defendants' summary judgment motion, in part, after concluding that
23  the plaintiff had not presented any evidence to support this claim.  Id.  Instead, the district court
    credited the defendants' statements that they each discharged short charges of pepper spray.  Id.
24  The Ninth Circuit stated that while plaintiff may have lacked a foundation to determine precisely
    how much spray was used, it could not reconcile the officers' testimony with plaintiff's version
    of events, especially given the extent of plaintiff's injuries.  Id. at 1027.  In the instant case,
25  defendants do not address the precise amount of O.C. spray they used.  However, after reading
    their declarations, it is difficult for this court to reconcile their version of events, which suggests
26  a much more moderate use of the spray, with plaintiff's version regarding how much was used.

1  consistent lack of cooperation, it was not unreasonable for defendants to be concerned that the

2  situation might become more dangerous when Dicey refused defendant Rayner's order to cuff up.

3  However, the undersigned cannot find that perceived threat justified use of an entire cannister of

4  O.C. spray by defendant Rayner.  When defendant Hastey allegedly emptied his can of O.C.

5  spray, no threat existed because Dicey had been sprayed by defendant Rayner and was on the

6  ground.

7                              *Effort to Temper Severity of Forceful Response*

8                    According to plaintiff, he was not allowed to wash the O.C spray off until several

9  hours after the incident, indicating that efforts were not made to temper the severity of the

10  forceful response.  Based on these allegations, the undesigned finds that little effort was made to

11  temper the severity of the forceful response.

12                    *Conclusion*

13                    The facts, taken in the light most favorable to plaintiff, demonstrate that

14  defendants used an excessive amount of force to quell a small disturbance.  For these reasons, the

15  undersigned finds that defendants' alleged conduct violated plaintiff's Eighth Amendment rights.

16                    B.  Were Plaintiff's Rights Clearly Established?

17                    In determining whether plaintiff's rights were clearly established, the undersigned

18  considers whether it would be clear to a reasonable officer that using the O.C. spray was

19  unlawful in the situation they confronted.  As discussed above, the Ninth Circuit has previously

20  found that small amounts of pepper spray or tear gas are justified if a prisoner refuses a warning

21  or upon other provocation presenting a reasonable possibility that slight force will be required.

22  Furnace, 705 F.3d 1028.

23                    Considering plaintiff's allegations, the undersigned finds that a reasonable

24  correctional officer would have known that it was unlawful to spray an entire cannister of O.C.

25  spray into the cell when inmate Dicey generally refused to cooperate.  A reasonable officer would

26  also have known that it was unlawful to spray an entire can of O.C. spray into the cell when

1   Dicey was on the cell floor and no longer posed a threat.

2          For the reasons discussed above, the undersigned finds that defendants are not

3   entitled to qualified immunity.

4   VI.  Plaintiff's Motion for Sanctions

5          Plaintiff argues that defendants should be sanctioned for not providing him with a

6   copy of his deposition transcript and the court reporter's contact information.  In the opposition

7   to this motion, defendants state that plaintiff was deposed on September 14, 2012.  On October

8   24, 2012, defense counsel sent a copy of the deposition transcript to the Litigation Department at

9   California State Prison-Lancaster ("Lancaster').  Defense counsel requested that the Litigation

10  Department arrange for plaintiff to review the deposition transcript, sign it and return the original

11  to defense counsel.

12         In response to plaintiff's motion for sanctions, defense counsel contacted the

13  Litigation Department at Lancaster and inquired as to the whereabouts of the transcript.  Defense

14  counsel was informed that plaintiff had not been allowed to review the transcript because it was

15  bound in plastic, which posed a security concern.  On February 12, 2013, defense counsel e-

16  mailed a copy of the deposition transcript to the Lancaster Litigation Department.  On February

17  13, 2013, plaintiff reviewed the transcript and made no changes.

18         There is no evidence that defendants intentionally withheld the deposition

19  transcript from plaintiff.  Because defendants did not engage in misconduct and plaintiff has had

20  an opportunity to review the deposition transcript, the motion for sanctions is denied.

21  VII.  Conclusion

22         Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for sanctions

23  (Dkt. No. 50) is denied;

24         IT IS HEREBY RECOMMENDED that defendants' summary judgment motion

25  (Dkt. No. 47) be denied.

26  ////

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:   March 20, 2013

10

11

12                                            KENDALL J. NEWMAN
                                             UNITED STATES MAGISTRATE JUDGE

13   craver.sj

14

15

16

17

18

19

20

21

22

23

24

25

26